Shuman, Appellant, *v.* Nolfi.

Argued March 21, 1960. Before Jones, C. J., Musmanno, Jones, Cohen, Bok and Eagen, JJ.

*Leonard J. Paletta,* with him *James B. Ceris, Gene K. Lynch, James P. McArdle,* and *McArdle, Harrington & McLaughlin,* for appellant.

*John D. Ray,* with him *Ray, Good and Hudson,* for appellee.

OPINION BY MR. JUSTICE EAGEN, April 18, 1960:

This is an appeal from a refusal to remove a compulsory nonsuit.

The evidence must be viewed in a light most favorable to the plaintiff: *Dobb v. Stetzler,* 369 Pa. 554, 87 A. 2d 308 (1952). The record considered in this manner discloses the following facts. The plaintiff on a fair, dry day in September, 1954, was walking across Hopewell Avenue in the community of Aliquippa, Beaver County, when he was struck by an automobile operated by the defendant and was seriously injured. Hopewell Avenue, an improved public highway, runs north and south, is 30 feet in width, and is divided into three ten-foot traffic lanes. The westerly lane is used for the parking of motor vehicles, the center lane for southbound traffic, and the easterly lane for northbound traffic.

Plaintiff was walking south on the sidewalk on the westerly side of the street when a friend, operating an automobile in a northerly direction in the easterly lane, stopped temporarily, hailed the plaintiff and offered him a ride. Plaintiff was crossing the street from west to east between intersections, in the direction of his friend's automobile, when the accident occurred. At the point where plaintiff started to cross the street, automobiles were parked parallel with and adjacent to the curb. As plaintiff stepped off the curb into the roadway, he saw a truck proceeding south in the westerly lane. He then walked between two parked cars and when he reached the end or outer edge of the parked cars,[1] he looked to his left and saw defendant's automobile traveling south in the westerly lane at a point located up the street to the north, the distance to

---

[1] At one point in his testimony, plaintiff testified he was walking between the parked cars when he looked to his left for traffic approaching in a southerly direction, but we are assuming his most favorable answer in this respect is correct.

which was estimated by other testimony to be 174 feet. Plaintiff then proceeded to take four or five steps into the street and then looked to his left again and saw that the defendant's automobile was right on top of him. The impact followed almost instantly.

Police investigating the accident found two skid marks in the southbound traffic lane where defendant had been traveling, 24' 3" in length. They were parallel to the curb. The right, or west, mark was 12' from the west curb and the left, or east, mark was 2½' from the line dividing the north and southbound lanes. In front of the right, or west, skid mark were two spots of blood 12' from the west curb, or 4½' from the east side of the parked cars. No testimony was offered as to the speed at which defendant's car was traveling. Its damage consisted of a dent on the right front between the headlight and the center of the grill.

At the close of plaintiff's case, the court entered a compulsory nonsuit, holding plaintiff guilty of contributory negligence. Subsequently, the court refused to remove the nonsuit, not only sustaining the finding of the trial judge that plaintiff was contributorily negligent, but also ruling that negligence on the part of the defendant had not been established.

The lower court's finding that the plaintiff was guilty of contributory negligence as a matter of law was clearly correct. It is axiomatic that the question of contributory negligence should not be taken from the jury's consideration except in a clear case and only when reasonable minds would not legitimately differ as to the conclusion of its existence: *Aaron v. Strausser*, 360 Pa. 82, 59 A. 2d 910 (1948).

It is not negligence per se for a pedestrian to cross a highway or street in the middle of the block: *Nugent v. Joerger*, 387 Pa. 330, 127 A. 2d 697 (1956). In doing so, a pedestrian has a perfect right to rely on the exercise of reasonable care by the drivers of auto-

214

mobiles on the highway: *Dempsey v. Cunco Eastern Press Ink Company of Pennsylvania*, 318 Pa. 557, 179 A. 220 (1935). However, a pedestrian who crosses a street between intersections is held to a higher degree of care than one who crosses on a crosswalk at a street intersection, and, by the same token, the driver of an automobile is held to a correspondingly lesser degree of care: *Harris v. DeFelice*, 379 Pa. 469, 109 A. 2d 174 (1954); *Rucheski v. Wisswesser et al.*, 355 Pa. 400, 50 A. 2d 291 (1947). It is equally well established that a pedestrian, particularly one crossing between intersections, must not only look before starting to cross the street but must continue to look as he proceeds across. Otherwise, he is guilty of negligence as a matter of law: *Aaron v. Strausser* (supra); *Goldberg v. Kelly*, 340 Pa. 430, 17 A. 2d 390 (1941); *Rafferty v. DiJohn*, 390 Pa. 123, 135 A. 2d 375 (1957); *Auel v. White*, 389 Pa. 208, 132 A. 2d 350 (1957); *Dwyer v. Kellerman*, 363 Pa. 593, 70 A. 2d 313 (1950).

In the instant case, the plaintiff looked before he started to cross the roadway but it is crystal clear that he did not continue to look as he proceeded to cross the busy thoroughfare. This in itself convicted him of contributory negligence. It was a clear violation of his definite obligation, even if no approaching traffic were visible before he undertook to cross. But, it was even more incumbent upon him to continue to look as a reasonably prudent man interested in his own safety would do, in view of the fact that, before he started to cross, he saw the automobile of the defendant approaching from a comparatively short distance away. His own foolhardiness in blindly jay-walking across a busy street at least contributed to this unfortunate occurrence. This renders recovery impossible under a long line of Pennsylvania authorities.

The judgment of the lower court is affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The effect of the decision of the lower court in the present case, affirmed by this Court, is to cause many a pedestrian to wonder whether, as he is about to cross a street, he should not first acquire a college education. Thus, in the event he is injured while crossing the street, he will be able to express in the purest of English, to the learned judges who hear his case, just what happened, because, otherwise, with all the right on his side, he may still lose, the learned judges being unable to understand, or lacking the patience to understand, what he is saying.

Nikola Shuman, the plaintiff here, was struck by an automobile as he was crossing a street in Aliquippa. He sued the owner of the offending car but, at the ensuing trial, the trial court nonsuited him, declaring him guilty of contributory negligence. But, as I read the record, I find that the only thing of which Nikola Shuman was guilty, was using bad English, which up to this moment has not been regarded as contributory negligence in any case that I find in the books.

However, as unpolished and ungrammatical as Nikola's speech may have been, he still told a clear enough story which entitled him to go to the jury on the questions of negligence and contributory negligence.

Briefly stated, the accident happened as Nikola was crossing Hopewell Avenue in Aliquippa between intersections, moving from the western to the eastern side of the roadway. In order to get to the other side, where a friend (Sam Bekitck) was waiting to give him a ride to his destination, Nikola had to pass between two parked cars. Before committing himself to the street he looked to the left and saw an automobile 174 feet away and he concluded that he had sufficient time to cross before it reached him. He took four or five steps and then, looking to the left again, he observed

the car bearing down on him. He endeavored to avoid the collision, but when once more he looked to the left, the car was about to strike. In desperation he leaped to the hood of the car. When he was asked at the trial: "Did any part of the car hit your right arm?" he replied: "No. I think when I jump on car that hickey on the hood maybe against the arm."

He was asked: "By 'hickey', do you mean the ornament on the front of the car?"

He replied: "I don't know. I am poor on the English."

But, even being "poor on the English," he still painted, with crude paints perhaps, a rather graphic picture of the accident. He said: "Then I get—when I get in between the cars, I take *a look on the left* if there was anybody coming, and I saw machine; *it look to me too far enough;* some kind store down there."*

Obviously, by "too far enough" he meant that the car was far enough away for him to cross in safety. He was then asked what happened. He replied: "I take it four or five steps. I think I got plenty time to make it cross, and then *turn to left*. I notice this—there is automobile; *then I turn left again.* I—car was right on me, trap me, and I make my mind to jump on the hood."

One does not need to speak Serbian dialect to understand that what Nikola was saying here is that he felt confident he had plenty of time within which to traverse the street without harm to himself. After he had taken four or five steps he saw the car again to his left. "I notice this—there is automobile". Then he says "I turn left again," which means that from the time he stepped off the curb to the time he was hit, he looked to his left at least three times. First, at the parked cars, second, when he had taken four or five

---

* All italics mine.

steps, and third, when the "car was right on me, trap me."

The trial court offered no explanation as to why it found Nikola so much at fault that his alleged dereliction was not even to be considered by a jury. The court merely arbitrarily declared that Nikola was guilty of contributory negligence. Then this Court, in affirming the nonsuit, said: "The plaintiff looked before he started to cross the roadway but it is crystal clear that he did not continue to look as he proceeded to cross the busy thoroughfare."

When a pedestrian sees a car 174 feet away he certainly has the right to assume that he can take four or five steps without being run down. He is not required by law or by common prudence to keep his head screwed to the left as he advances on his legitimate errand. The Majority Opinion admits that Hopewell Avenue was a "busy thoroughfare." Thus Nikola had to be concerned about what was ahead of him and to the right of him, as well as to what was on his left. It would not have helped Nikola much if, by keeping his eyes constantly riveted to his left, he had walked into an open manhole ahead.

It is true that Nikola crossed Hopewell Avenue between intersections and while ordinarily one may be on safer territory at intersections, the law does not make crossing between intersections an act of contributory negligence. In *Nugent v. Joerger,* 387 Pa. 330, 332, we said: "The tempo of the twentieth century being what it is the law recognizes that a pedestrian is entitled to cross in the middle of a block in order to gain a few seconds' time which will hasten him on to his destination."

We said further: "A pedestrian crossing in the middle of a block, in full view of an oncoming car, cannot legally be declared guilty of contributory negligence if he reasonably assumes that the motorist, having am-

ple time within which to stop his car or alter his course to avoid hitting him, will not run him down in defiance of the laws of safety, the standards of the motor code, and the edicts of humanity." (p. 334, supra).

In addition to finding the plaintiff guilty of contributory negligence the lower Court concluded that the defendant was not negligent. It seems to me, quite to the contrary, that a very clear case of negligence is made against a motorist when it is shown that he saw, or should have seen, a pedestrian on the street 174 feet ahead of him, and that, in spite of what he sees, he continues ahead with speed unabated and strikes his victim with such force that the impact tears off one of the victim's shoes, and hurls it 40 feet, in the meantime breaking his right leg and inflicting deep cuts in his arm.

The Majority Opinion says: "No testimony was offered as to the speed at which the defendant's car was traveling."

There was evidence enough of great speed when it was shown that the defendant's car skidded 24 feet 3 inches before it came to a stop and, as already stated, one of the plaintiff's shoes, because of the violence of the impact, flew through the air for 40 feet.

We have seen, as Nikola himself said, that he was "poor on the English." Is he now to be uncompensated for his broken leg because of his broken English? An idea of the dilapidated vehicle of expression on which he moved through the trial can be gathered from his description on the witness stand of the man who had offered him a ride. He said: "I look at him. I know him. He was work there president Serbian Club, and I see him, and almost at the end of the building to the left he stop; so I go over there on sidewalk."

Defendant's counsel, without attributing to him any malevolent motive, endeavored to have Nikola admit contributory negligence, but Nikola, limping as he did

in a medium not his own, was agile enough mentally to see what his legal adversary was attempting to do to him, just as he was agile enough to leap on the hood of the car which might otherwise have killed him.

A perfect case of contributory negligence would be made out against Nikola if he were to say that he was struck immediately after he stepped out betwen the two parked cars. The astute cross-examiner asked Nikola: "When you saw this car in front of you, do you remember what it was—you were just stepping out between the cars, and there was a Ford, and you jumped on the Ford. Do you remember?"

But Nikola sidestepped the thrust. He replied: "No, that wasn't that way. When *I look left,* I see car too far; so I could make it. I take it four or five steps; *then I turn again to my—throw my eyes over here* (indicating); the car on me; so I jump."

By "too far" he obviously meant the car was too far away for him to have any doubt about his getting across safely.

Defendant's counsel now tried to make it appear that Nikola was standing on the curb or had just passed through the parked cars and then, as the car came by, leaped aboard like a truant schoolboy sneaking a ride on a passing truck. Counsel asked: "Here. Look at this. Weren't you standing right there (indicating) when you saw this car, and then, when it got down close, you jumped on the hood?"

But even with his un-college-bred brain, Nikola could see the trap into which defendant's counsel was attempting to lure him. He replied: "I jump it right away. I make it steps. I make it four or five steps, maybe more, then I jump when car approach me."

The first "I jump it right away" was clearly intended as an inquiring repetition of defendant's counsel's question, as if to say: "I jump it right away?"

And then came the explanation: "I make it four or five steps, maybe more, then I jump when car approach me."

The cross-examiner tried another stratagem: "You went up just opposite his car, and then you went between the parked cars to go straight across to Bekitch's car, didn't you?"

If Nikola had replied Yes to this question he would have admitted that he had proceeded directly through parked cars and, without looking, walked straight into the path of an oncoming car. Nikola saw this, uneducated as he was, and he replied with a flat "No." And then, shattering the cross-examiner's dream for the suicidal reply, Nikola went on to say very specifically: "I *take look* when I get between cars."

Since we are compelled to read the record in the light most favorable to Nikola, we find, by this answer, added to his other answers, the established fact that Nikola looked before he committed himself to the crossing, looked as he passed between the parked cars, looked when he had taken four or five steps, and looked just as the car was about to hit him. How many looks must a pedestrian take in order not to be hit by a speeding, heedless car, and even more, so as not to be disastrously hit by an unappraising court nonsuit?

Defendant's counsel tried again: "Q. You don't understand me. You went up the sidewalk until you got up to where Bekitch's car was opposite you? A. Yes. Q. Right straight ahead? A. Yes, right in front of me. Q. Then you went between the parked cars? A. Yes."

And now comes the cross-examiner's pitch: "Going over to Bekitch's car?" In other words, going straight ahead to Bekitch's car without looking.

But Nikola saw the curve in the cross-examiner's throw and he replied: "No. *I look.* I didn't go right away."

The cross-examiner now tried another curve: "There was a space between the parked cars and the Bekitch car to which you were going, is that right?"

This was obviously intended to fetch an affirmative answer which could be interpreted as. showing that Nikola pushed out through the open space, not looking, not heeding, not watching out for oncoming cars. But the answer was not what the cross-examiner expected. Nikola was careless about grammar, but not careless about the manner in which he crossed the street. He replied: "I get out between the cars, and *then I look, and after I see it was far enough I could make it—*"

Here the cross-examiner more or less gave up. However, he had not failed. Although he was unable to confuse Nikola, he did succeed in convincing the trial court that, somehow, Nikola was guilty of contributory negligence, not because of what Nikola said but because of what the court did not take the time to understand what Nikola said.

Thus, although Nikola's natural intelligence and adherence to the simple truth saved him from the bear traps laid down by the cross-examiner, it did not save him from tumbling into the pit of an overly-meticulous juridic-technical appraisement of his stumbling vocabulary.

And so, I end this dissent as I began, namely: When one is contemplating crossing a street he should first take stock of his educational equipment and ask himself certain questions: Will he be able to cope with the intricacies of the English language on the witness stand? Will the judge understand what he is saying, with his heart but only falteringly with his tongue? Will he be able to describe what he did so that it cannot be twisted into seemingly something else?

If he cannot answer all these questions in the affirmative, he had better delay that first step into the street until he can go to college or at least take a cor-

repondence course on how to win verdicts and influence technicians. Then, if he crosses the street and is hurt, and he has a good case, he will be able to describe in faultless English and impeccable grammar, unblemished by confusing contributing clauses and split infinitives, just what happened to him. And then, when the verdict is returned in his favor, Justice will remove her blindfold and smile at this demonstration of perfection in an imperfect world.