Smith, Appellant, *v.* Pittsburgh Railways
Company

Argued September 29, 1961. Before BELL, C. J.,
MUSMANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

*Harvey E. Schauffler, Jr.,* for appellant.

*Leo Daniels,* with him *Prichard, Lawler & Geltz,*
for appellee.

Opinion by Mr. Justice Benjamin R. Jones, December 5, 1961:

On January 28, 1957, appellant, Roselyn K. Smith, and her sixteen year old daughter, Carol Smith, were passengers on an uncrowded streetcar owned and operated by the Pittsburgh Railways Company, appellee. Appellant and her daughter were seated on a long seat located lengthwise in the extreme right front portion of the streetcar. According to appellant, the streetcar ride was "rough" and the car "was jerking just as though he [the motorman] was playing with the pedal" and, as the streetcar approached the so-called Bloomfield stop, passengers expecting to alight at that stop came forward and "he [the motorman] jerked that streetcar again" and a man, standing near where appellant was seated, was thrown off balance by the jolt and "the heel of his foot just stomped right down on the great toe of [appellant's] left foot" causing severe injuries. Furthermore, according to appellant, the streetcar was about to stop when the jolt occurred.[1] As the car approached the Bloomfield stop, Carol Smith left her seat to ask the motorman for a streetcar schedule and she "had [her] hand on the railing when the motorman started the car real fast" and she fell to the floor.[2] Except for the statement that other passengers were "thrust back" there is no evidence that the alleged "jolt" or "jerk" affected any other passengers in the streetcar.

At trial in the Court of Common Pleas of Allegheny County that court entered a compulsory nonsuit and,

---

[1] According to the complaint, the "jerk" or "jolt" occurred when the streetcar was "started up without warning" by the motorman.

[2] Carol Smith stated: "I wasn't holding on to it [the railing], but I had my hand on it" and "I put my hand on the pole just to brace myself while I was going forward . . . ."

from its refusal to remove this nonsuit and the entry of judgment, this appeal was taken.

In passing upon this appeal we must review the testimony in the light most favorable to the appellant and give to her the benefit of every reasonable inference arising from such testimony: *Shuman v. Nolfi*, 399 Pa. 211, 159 A. 2d 716.

The applicable law is clear. In *Staller v. Philadelphia Rapid Transit Co.*, 339 Pa. 100, 103, 104, 14 A. 2d 289, we stated: "It is well established by a long line of decisions that testimony indicating that a moving trolley car jerked suddenly or violently is not sufficient, of itself, to establish negligence in its operation. There must be a showing of additional facts and circumstances from which it clearly appears that the movement of the car was so unusual and extraordinary as to be beyond a passenger's reasonable anticipation, and nothing short of evidence that the allegedly unusual movement had an extraordinary disturbing effect upon other passengers, or evidence of an accident, the manner of the occurrence of which or the effect of which upon the injured person inherently establishes the unusual character of the jolt or jerk, will suffice." See also: *Zager v. Pittsburgh Railways Co.*, 401 Pa. 516, 165 A. 2d 30; *Schilling v. Pittsburgh Railways Co.*, 394 Pa. 126, 145 A. 2d 688; *Herholtz v. West Penn Railways Co.*, 362 Pa. 501, 66 A. 2d 839; *Smith v. Pittsburgh Railways Co.*, 314 Pa. 541, 171 A. 879; *Bollar v. Pittsburgh Railways Co.*, 153 Pa. Superior Ct. 199, 33 A. 2d 261; *Monahan v. Pittsburgh Railways Co.*, 149 Pa. Superior Ct. 283, 27 A. 2d 534; *Waldov v. Philadelphia Rapid Transit Co.*, 120 Pa. Superior Ct. 304, 182 A. 129.

An examination of the testimony produced by appellant fails to show that the movement of this streetcar was so unusual and extraordinary as to be beyond the reasonable anticipation of the passengers therein

and it is clear that the evidence falls far short of the standard of proof required to fasten liability upon appellee.

*Tilton v. Philadelphia Rapid Transit Company,* 231 Pa. 63, 79 A. 877; *Sanson v. Philadelphia Rapid Transit Company,* 239 Pa. 505, 86 A. 1069, and *Angelo v. Pittsburgh Railways Co.,* 189 Pa. Superior Ct. 574, 151 A. 2d 867, relied upon by the appellants, are clearly inapposite.

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On January 28, 1957, the motorman of the Pittsburgh Railways Company streetcar involved in this litigation, who was apparently angry with himself and the world in general, picked up passengers on the northside of Pittsburgh and then furiously headed across the Allegheny River into downtown Pittsburgh and out to Bloomfield. His speed was such that from time to time the trolley pole jumped the overhead high voltage wire, whereupon he would jerk the car to a stop, leap off to re-engage the trolley, swearing all the while and intermixing with his profanity a variety of indelicate and indecent phrases. As he bounded over the rails he applied the power in fits and starts as if playing the pedals of a pipe organ and thereby shaking up the passengers to such a degree that one of them exclaimed: "This is the roughest ride we have ever had." Other passengers described the rough trip as a "terrible ride."

As the car approached the Bloomfield stop, the motorman slowed down and the alighting passengers prepared to disembark. Suddenly the motorman, possibly realizing that he was moving into the stop too uneventfully, threw on a sudden burst of power and jolted the car forward as if he had decided not to stop after all.

In consequence, *all* the passengers were thrown backward and one of them, a sixteen-year-old girl, measured her length on the floor. Her mother testified that the girl was "terribly embarrassed because her dress went up when she fell."

Still another passenger, a large, heavy six-foot gentleman, went into an involuntary jig to maintain equilibrium and balance. He executed a few steps backwards and then eventually braked his anticipatory fall by anchoring one foot firmly to what he thought was the floor. It turned out to be the foot of another passenger. The weight of his body and the violence with which he bore down fractured the big toe of the left foot of the startled passenger, who is the plaintiff in this lawsuit which terminated with a jolt in the court below in a court-imposed nonsuit.

This Court has affirmed that nonsuit in an opinion which would suggest that the Court assumes that the ride of the momentous streetcar was as smooth and tranquil as that of a gondola moving over the Grand Canal of Venice. The Majority Opinion states: "An examination of the testimony produced by appellant fails to show that the movement of this streetcar was so unusual and extraordinary as to be beyond the reasonable anticipation of the passengers therein and it is clear that the evidence falls far short of the standard of proof required to fasten liability upon appellee [the streetcar company]."

Are passengers to anticipate that a streetcar will be operated in such headlong fashion that the trolley pole does a St. Vitus dance on the roof? Are they to foresee that an angry and mysteriously infuriated motorman will do a dance on the power pedal? Is a trip on a streetcar to be considered a usual one when one passenger is hurled to the floor, another does an impromptu ballet, and *all* of them are thrown back?

How unusual must a streetcar ride be when a passenger suffers a fractured toe from the pirouetting of a six-foot passenger before there may be a recovery for the injury? Even the attorney for the streetcar company admitted the jolt, of which the plaintiff complains, was a *"violent* jolt." Is violence now so much a part of our daily existence that it no longer arouses surprise and cannot stir the law into enforcing redress for injuries suffered as the result of violence?

The personal characteristics of the motorman in this case would have no bearing, generally speaking, on the manner in which he operated his car. However, since the whole streetcar was under his absolute domination and control, his conduct may help the legal observer to determine whether he did operate the car in a manner to cause the results suffered by the plaintiff. In describing the motorman, the plaintiff employed a phraseology of her own which would not be without meaning to the jury. She said that the motorman was "snotty." The dictionary defines this colloquial and slangy word as meaning contemptible, dirty, offensive, nasty, snooty, offish and supercilious. A motorman who could be nasty and snooty would be just the kind of a motorman who would slam on his brakes and precipitately throw on his power regardless of what happened to his passengers.

The plaintiff added that the motorman was also "snippy." This is not as pungent a description as "snotty," but, added to everything else said about the motorman, reveals an operator given to impetuosity. The dictionary defines "snippy" as being short-tempered, tart, and snappish. It would not be too much to assume that a motorman who is nasty, snooty, snappish, short-tempered, and supercilious would be just the kind of motorman who would operate his car with such angry abandon and unconcern over the safety of his passengers that he would lose his trolley three or four

times in a short run and then slam on his brakes with such instantaneous violence as to produce the toe-smashing event heretofore narrated.

The plaintiff's counsel in his brief cites three cases, all of which support his position that this case should have been submitted to the jury. In *Sanson v. Philadelphia Rapid Transit Company*, 239 Pa. 505, the plaintiff-passenger signalled the motorman he intended to get off at the next stop. The motorman acknowledged the signal and began to slow down. As the plaintiff, however, rose from his seat and took hold of the handle of the door, the motorman suddenly increased the speed of the car, causing the plaintiff to be thrown to the platform. Verdict for the plaintiff was sustained.

In *Tilton v. Philadelphia Rapid Transit Company*, 231 Pa. 63, the plaintiff was nonsuited after testifying that the car suddenly stopped and he was thrown forward striking the seat ahead of him. This Court removed the nonsuit, declaring: "Under ordinary circumstances, with the car under proper control, when it is brought to a stop by the motorman, it is not done so abruptly as to injure a passenger, by throwing him forward against the seat in front of him. . . . Such an unusual manner of stopping the car called for explanation by the defendant."

In *Angelo v. Pittsburgh Railways Company*, 189 Pa. Superior Ct. 574, the plaintiff was injured when the bus in which she was riding suddenly swerved to one side and made a violent and unusual stop, throwing her against a pole in the car to her injury. She recovered a verdict and the defendant appealed. The Superior Court affirmed the verdict, stating: "In this connection there can be no doubt that proof of the sudden and unusual jolt in the operation of the bus made out a prima facie case and raised a presumption of negligence. This is the law even in street car cases. . . . A carrier is bound to exercise the highest practical degree

of care, and if a passenger is injured as the result of the manner of operation of the carrier, the burden is upon the carrier to show that the injury could not have been prevented by such care."

In the case at bar, the defendant company should have been required to show that the motorman could not have avoided the extraordinary circumstances in the car when, because of his operation, the car jolted, jerked and otherwise so carried on that a large passenger was thrown off balance and came down heavily on the foot of the plaintiff who was innocently sitting in the car minding her own business and now has a disabled foot, which will impede her walking, if she determines she will never ride streetcars again.

The Majority does not attempt to analyze these three cases or show how they differ in principle from the principle controlling the facts in the case at bar. It merely says that these cases "are clearly *inapposite*." (Emphasis supplied.) Even the brief treatment I have given them demonstrates that they are quite *apposite,* and certainly far more apposite than the cases which, like a long train of cars, have been cited by the Majority. The first case mentioned by the Majority, *Staller v. Philadelphia Rapid Transit Co.,* 339 Pa. 100, is about as apposite as the comparison of a streetcar with a wheel barrow. In the *Staller* case the plaintiff got up from his seat because "he was tired and wanted to stretch." In the stretching process, combined with some jerks of the streetcar, one of his arms projected through an open window and was caught by a trolley car going in the opposite direction.

*Waldov v. Philadelphia Rapid Transit Co.,* 120 Pa. Superior Ct. 304, is equally inapposite. There the plaintiff was hurt while in the act of stepping down on a lower step of the car while the doors were open and before the car came to a complete stop.

*Zager v. Pittsburgh Railways Co.*, 401 Pa. 516, is perhaps the most inapposite of all. There the passenger not only did not fall but there was no evidence that the sudden stopping which she said caused her injuries had any effect on other passengers.

*Monahan v. Pittsburgh Railways Co.*, 149 Pa. Superior Ct. 283: It would be difficult to conjure up a case more inapposite than this one. The only evidence in *Monahan* of the effect on the other passengers was that they became "excited" and two or three of them "bent over."

*Smith v. Pittsburgh Railways Co.*, 314 Pa. 541, is particularly inapposite. The plaintiff was the only passenger who said the car had jerked. Five other passengers testified that there was nothing unusual or violent about operation of the car.

*Bollar v. Pittsburgh Railways Co.*, 153 Pa. Superior Ct. 199, is peculiarly inapposite. In that case the motorman had to stop because an automobile without lights (this was at night) suddenly pulled out from a side street in front of the car.

*Herholtz v. West Penn Railways Co.*, 362 Pa. 501, must also be classified as inapposite. In that case, none of the other passengers in the car were jolted off their feet.

And thus, because of all this inappositeness, Mrs. Smith is out of court. She boarded a streetcar, she paid her money and accordingly had the right to be taken to her destination with the care that a common carrier is required to exercise in accordance with the law of the land. A motorman who, from the evidence adduced at the trial, revealed himself to be masterfully incompetent and superbly insolent, and with personal traits inapposite to the skill required properly to run a streetcar, so operated the car as to fracture her foot. She hobbled into court for a redress of her grievance

and she was compelled to hobble out with her grievance unredressed.

And she will now hobble through life still unredressed, not because a jury passed on her rights, but because a long series of inapposite cases passed over her.